IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 23CR384 |
| v. | ) | |
| | ) | |
| CHRISTOPHER SINGLETON | ) | Judge Virginia M. Kendall |
| | ) | |

## MOTION TO SUPPRESS STATEMENTS IN VIOLATION OF MIRANDA

Defendant, Christopher Singleton, by and through his attorney, Joshua B. Kutnick, moves this Court to suppress as evidence statements made by the defendant in violation of his privilege against incrimination pursuant to the Fifth and Fourteenth Amendments of the U.S. Constitution and *Miranda v. Arizona,* 384 U.S. 436 (1966).

BACKGROUND

Singleton had been previously charged with aggravated fleeing and eluding which was dismissed in the preliminary court on October 14, 2022. (Cook County case no. 22111278101). He was discharged, however, he was subsequently indicted for that offense on Nov. 14, 2022. The court mailed notification to his last known address on November 22, 2022, but he had relocated and never received that notice. A bench warrant was issued on December 16, 2022. (Cook County case no. 22 CR 6017801).

On February 3, 2023, Singleton was arrested by Cook County Sheriff's Police based on the warrant for failure to appear. At the Cook County Police Headquarters in Maywood, officers took him out of the lockup as he waited to be transferred to Cook County to answer to the warrant. He was placed him into an interrogation room. After being escorted in handcuffs, the officers uncuffed him and left the room. He remained alone in the room for about 6 minutes. At that point, five officers (two CPD And three FBI officers, collectively

"the agents") entered the room and introduced themselves and told him they were there to talk to him. *See* Exhibit A, at 20:47. [1]

After he was given Miranda warnings, Singleton signed a Miranda waiver, and the officers began talking to him. *Id.* at 22:55 – 24:41. After approximately 20 minutes, during which the agents largely talked *to* Singelton and he listened, Singleton said: "Is there a way I can talk to so-called lawyer or something? I don't understand." *Id*. at. 40:04. The officers did not stop the interview right there but tried to persuade Singleton to continue. They said, among other things: "If you want to talk to the lawyer, you can, but it will be to your benefit to understand what we are trying to talk to you about so that you can talk to your lawyer." *Id.* at 40:10 -40:40. They were persuading him to continue for two whole minutes during which Singleton remained quiet.

The officers then allegedly heard Singleton agree to continue, though that is not audible on the video. *Id.* at 42:08. After an additional 12 minutes of interrogation, Singleton again asked for an attorney: "Can I just speak with my lawyer? I have never been through anything like this. I don't understand". *Id*. at 54:48. Although some of the agents, at this point, closed their notebooks understanding that the interview was over, but one of the agents continued attempting to change Singleton's mind. He tried to persuade him to change his mind for an additional five minutes. At that point, one of the two remaining agents asked him if he wanted to continue, and Singleton apparently nodded. *Id*. at 59:44. Even then Singleton inquired again: "If I were to speak with my lawyer, would this be the same [the outcome] …if I were to speak with my lawyer?" *Id*. at 1:05:17. The officer then responded: "If you were to get a lawyer, you may just get charged, I don't know. Do you

---

[1] Exhibit A, the video of the interview, will be provided to the Court in a flash drive.

want to get charged?" *Id.* at 1:05:26. After each request for a lawyer, disregarded by the officers, Singleton subsequently made incriminating statements.

## ARGUMENT

I. **All Statements Allegedly Made by Singleton When Questioned Were Obtained in Violation of Miranda as Singleton Clearly and Unambiguously Invoked his Right to an Attorney on Two Separate Occasions Which the Agents Disregarded.**

The Fifth Amendment privilege protects a person against being incriminated by his own compelled communications. *Doe v. United States*, 487 U.S. 201, 207 (1988). To trigger the Fifth Amendment protection, a compelled statement must be "testimonial". *U.S. v. Hubbell*, 530 U.S. 27, 34 (2000). A statement is testimonial if a defendant's communication "explicitly or implicitly, relate[s] a factual assertion or disclose information." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990). Thus, a vast majority of statements will be testimonial. *Id*. Miranda only affects the admissibility of statements obtained through "custodial interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). Even when a formal arrest has not yet occurred, a suspect may be in custody for Miranda purposes if his or her freedom of movement is restrained to the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

After a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. *Davis v. U.S.*, 512 U.S. 452, 461 (1994). If the suspect clearly requested counsel his or her "post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself" but can only be relevant to the determination of waiver. *Smith v. Illinois*, 469 U.S. 91, 100 (1984). If the accused requests an attorney, counsel must be provided before questioning. *Edwards v. Arizona*, 451 U.S. 477, 484-85

3

(1981). The law enforcement cannot reinitiate interrogation without counsel present. *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

In *Davis v. U.S.*, the U.S. Supreme Court clarified that the *Edwards* rule serves "the prophylactic purpose of preventing officers from *badgering a suspect into waiving his previously asserted Miranda rights*" [emphasis added] and added that its applicability requires courts to determine, through an objective inquiry, whether the accused actually invoked his right to counsel. *Davis*, 512 U.S. at 452. The objective inquiry required some statement that can *reasonably be construed* [emphasis added] to be an expression of a desire for an attorney's assistance. *Id*. A suspect must articulate desire to have counsel present sufficiently clearly that reasonable officer in circumstances would understand statement to be a request for attorney. *Id*. It is the government's burden to show that Singleton "voluntarily, knowingly and intelligently" waived his right to counsel. *Miranda*, 384 U.S. at 444.

     A.    **Singleton was in Custody When Interrogated.**

Singleton was cuffed and in custody when he was taken to the interrogation room and interviewed in the presence of five agents. A determination of whether a defendant is in custody depends on an evaluation of the circumstances by a reasonable person in the suspect's position. *Berkemer v. McCarty* 468 U.S. 420 (1984). A reasonable person in Singleton's position would not have felt free to leave. The fact that Singleton was under arrest, as well as the location, timing, and length of questioning (an hour and a half) all point to this being a clear case of custodial interrogation. Singleton was questioned at a police station in an interrogation room by five agents. He was not free to leave, and the goal of questioning was for Singleton to make incriminating statements.

The agents gave Singleton *Miranda* warnings at the onset of the interview. Although an officer's belief regarding the nature of interrogation is irrelevant to the

4

assessment of whether there was a custodial interrogation, if the officer manifests his beliefs to the defendant under interrogation, and if that would have affected a reasonable person's perception of his or her freedom under the circumstances, then it is a relevant factor in determining whether this was a custodial interrogation. *Stansbury v California* , 511 U.S. at 325 (internal quotations omitted). The fact that Singleton received Miranda warnings immediately after everyone introduced themselves, coupled with the fact that he was in a police station, under arrest, and initially placed in handcuffs, objectively point to this being a custodial investigation.

> **B.  Singleton Invoked his Right to an Attorney Clearly and Unambiguously with his First Invocation and the Agents Follow-up Amounted to Badgering and/or Interrogation, which Singleton Succumbed to Eventually.**

Singleton's first statement - "is there a way I can talk to a so-called lawyer or something? I don't understand." -  was a clear and unambiguous invocation of his Miranda rights, and what followed was the agents' attempt to persuade or coerce him into changing his mind, which Singleton relented to ultimately. Courts can look to prior context when determining whether a defendant unambiguously invoked his right to counsel. *U.S. v. Hunter*, 708 F.3d 938, 945 (7th Cir. 2013).

> **1.  Singleton Invoked his Right to an Attorney Clearly and Unambiguously with the First Invocation.**

Law enforcement officers may continue questioning until and unless a suspect clearly requests an attorney. *Miranda,* 384 U.S. at 436. When a suspect in custody invokes that right at any time, the police must immediately cease questioning him until an attorney is present. *Edwards v. Arizona,* 451 U.S. 477, 484–485 (1981). The objective inquiry requires some statement that can *reasonably be construed* [emphasis added] to be an expression of a desire for an attorney's assistance. *Davis,* 512 U.S. at 452. A suspect must

5

articulate a desire to have counsel present sufficiently clearly that reasonable officer in circumstances would understand statement to be request for attorney. *Id*.

Since *Edwards*, various statements have been deemed to be sufficient to be considered an invocation of the right to counsel. Singleton's first statement, "is there a way I can talk to a so-called lawyer or something?" can "*reasonably be construed* [emphasis added] to be an expression of a desire for an attorney's assistance". *Davis,* 512 U.S. at 452. Singleton's statement falls squarely in the line of statements that would be considered unambiguous invocations of the right to attorney. In *U.S. v Lee*, the Seventh Circuit said that there was no exact formula of magic words for an accused to invoke his right to counsel and proceeded to rule that the statement of the defendant it that case – "Can I have a lawyer?"- is enough to invoke that right. *U.S. v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005).

The statement in *Lee* – Can I have a lawyer? – is semantically indistinguishable from Singleton's "is there a way I can talk to a so-called lawyer" and practically the same as Singleton's second invocation - "can I speak to my lawyer?" (see below for discussion on the second statement). The fact that Singleton started his first invocation with "is there any way I can" instead of starting his question with just "can I", does not take away from the unambiguity of the invocation as it is only a different way of expressing the same present desire to talk to an attorney. In fact, using "is there any way" simply adds a tone of politeness to the request but other than that the meaning is absolutely the same as a question that starts with "can I".

The Seventh Circuit once contended with a statement that contained "is there any way". In *Lord v. Duckworth*, after giving an 80-minute-long confession and agreeing to assist in helping the police find a murder weapon, the defendant said "I cannot afford a lawyer, but is there any way I can get one?". 29 F.3d 1216, 1218 (7th Cir. 1994). The Seventh Circuit said that, taken out of context, Lord's statement might have been enough to invoke

6

counsel, but in context, "particularly in light of Lord's complete cooperation with authorities before requesting an attorney," Lord's statement lacked "the clear implication of a present desire to consult with counsel". *Id*. at 1221.

When Singleton's statement is placed within context, i.e. the conversation that preceded it, it is even more evident that this is an unambiguous request for an attorney. Before that moment, it was the *agents* who did most of the talking for almost twenty minutes, trying to get Singleton to answer their questions. Singleton answered a handful of questions with a "yes" or "no" but mostly stayed quiet. When the agents asked him to identify himself in a picture and essentially incriminate himself, Singleton finally realized what this interview was all about and asked for an attorney. *See* Exhibit A, at 37:29 – 40:04. Therefore, Singleton, unlike Lord, did not provide complete cooperation before he invoked. Singleton was essentially refusing to cooperate, was mostly listening and barely spoke while the agents were working hard to get him to make an incriminating statement. Unlike Lord's, Singleton's interview at the point of the first invocation was not an 80-minute confession but a 20-minute-long attempt by the agents to get Singleton to answer their questions. Finally, it is worth noting that the Seventh Circuit had no issue with the construction of the question that starts with "is there any way".

Like other defendants who successfully invoked their right to an attorney, Singleton used the word "can" rather than should, might, or may. See *U.S. v Allegra*, 187 F.Supp.3d 918, 924 (N.D.Ill. Nov, 19, 2015) (finding that the defendant's "so can you provide me with attorney?," was sufficient to invoke his right to counsel and should have ended the interrogation as it is indistinguishable from *Lee's* "can I have a lawyer", or from "I mean, but can I call one now" in *U.S. v. Wysinger*, 683 F.3d. 784, 790-791 (7th Cir, 2012) and emphasizing the defendant's the use of "can" instead of a hedge word like "should or might")).

7

Contrast Singleton's statements with what the defendant in *U.S. v. Shabaz*, another Seventh Circuit case, said. In that case, the defendant asked, "am I going to be able to get an attorney?", which was deemed by the court not to be a sufficiently clear invocation. 579 F.3d. 815, 818 (7th Cir. 2009). The court reasoned that a common point among the statements that have been deemed insufficient is that they did not clearly imply a "present desire to consult with counsel." *Shabaz*, 579 F.3d. at 819 (quoting *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994)). The Seventh Circuit said that "can" was a 'decisive word" that signals the suspect is inquiring into his present ability to be able to obtain a lawyer and have the opportunity or possibility to obtain a lawyer. *U.S. v. Hunter*, 708 F.3d, 938, 934-44 (7th Cir. 2013). "We noted … decisive language like the word 'can'—as opposed to indecisive words like "should"—indicating that … request, 'Can you call my attorney?' was inherently unambiguous." *Id.* at 948.

Neither of Singleton's statements were followed with "but" or "hedge" words, such as "I think" or "I may" or "maybe". For example, the following statements in *U.S. v. Thousand* did not qualify as sufficient to invoke attorney: "I think I need a lawyer, I don't know, but I want to cooperate" (558, Fed. Appx. 666, 671-672 (7th Cir. 2012)). Also, the statement in *U.S. v. Hampton*: "Yeah, I do but you…", followed by five seconds of silence, and a clarifying question of whether presumably getting an attorney will effect "what's going on" also did not qualify. *U.S. v. Hampton*, 675 F.3d. 720, 724-25 (7th Cir. 2012).

Singleton's statement is markedly different from the statements that were not found to be sufficient invocations, such as *Allegra*'s "Do I need an attorney?" or "I probably should have counsel" *Allegra.* 187 F.Supp.3d at 921. Or "Maybe I should talk to the lawyer" (*Davis* at 455), "I think I need a lawyer" (*Thousand* at 671-672), or "Am I going to be able to get an attorney?" (*Shabaz* at 818). Singleton's invocation is substantially the same as the ones that were found to be unequivocal invocations of the right to an attorney. This is because

8

Singleton's first invocation, although in the form of a question, was not an advice-seeking question, or a question about general or future ability to talk to an attorney. His question was a request for action, firmly rooted in the present desire to have an attorney. The Seventh Circuit said that the court "hypothesized several statements that would be clear invocations of counsel....[a]ll of them request an action (or permission to act); they are more than observations." *U.S. v. Hampton*, 885 F.3d 1016, 1020 (7th Cir. 2018). Singleton's statement "Is there any way I can get a so-called attorney?" is not an observation or general question about the ability to get a court-appointed attorney. It can be only interpreted as a request for action. Especially when his words are taken in context of what preceded those words.

The words that were exchanged after the invocation cannot be used to cast doubt on the lack of ambiguity in the defendant's invocation (see *Smith v. Illinois*, 469 U.S. 91, 100 (1984)), but what follows sheds light on whether the agents thought the statement was ambiguous or not. Courts are allowed to evaluate how a reasonable officer would have understood the request. *Davis*, 512 U.S. at 459. In Singleton's case, their responses indicate that the agents understood very well he was seeking an attorney and, therefore, that his invocation was not ambiguous.

The sequence of events in this interview is indistinguishable from what happened in *Allegra*, where the agents, after the defendant's invocation, said: "That's your right if you want to talk to an attorney. That's absolutely fine and we respect that. But what happens now is, basically, it's done." and then proceeding to encourage the defendant to reconsider. *Allegra*, 187 F.Supp.3d 918, 924. The court in *Allegra* said that "a reasonable officer in the agent's position would have understood Allegra's question as a request for counsel, they were required to stop the interview" and went on to rule that the agent's verbal responses are additional evidence that Allegra successfully invoked his right to counsel. *Allegra* at

9

924. The same thing happened during Singleton's interview. The agents understood this to be an unequivocal invocation for an attorney based on their responses that followed and which are transcribed below.

### 2. The Agents Follow-up Amounts to Badgering, Undercutting and/or Interrogation Which is Prohibited.

After Singleton's first unambiguous invocation of his right to an attorney, the agents proceeded to badger him and persuade him to change his mind. The Seventh Circuit ruled that if a suspect makes an unambiguous request for an attorney, then there should be no need for a clarification. *Hunter*, 708 F.3d at 947. "Indeed, allowing police officers to continue asking questions—no matter how "benign" or "open-ended"—after a suspect unambiguously requests an attorney could indirectly undercut the suspect and eventually cause the suspect to question his initial, unambiguous request for an attorney." *Id.* It is prohibited to "badger… a suspect into waiving his previously asserted Miranda rights.". *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). In Singleton's case, the agents kept trying to get Singleton to change his mind after the first invocation for two whole minutes. *See* Exhibit A, 40:04 – 42:12.

> Agent One: "If you want to talk to the lawyer, you can but it will to your benefit to understand what we are talking to you about. So that you can talk to your lawyer. Does that make sense?"
>
> Defendant: Yes.
>
> Agent One: So if you want to stop right now, you can. If you want to at least listen… you don't have to say anything, you can just listen. We want to show you and talk to you and give you the opportunity. We can keep going. It's up to you.
>
> Agent Two: And with that being said and this being the unique opportunity that it is. Again we know who you are and how you fit into this and we know other people that you hang out with and the important thing no matter what happens here today, is that when we do leave, this is a conversation that we would advise you to keep to yourself and not let people in the street know…. That we are coming and talking to you. Cause that is not

10

|  |  |
|---|---|
| | something …cause that is not something that's going to play in your favor. Do you understand what I am saying? |
| Defendant: | Yes. |
| Agent Two: | I know this is not how you expected the morning to go … this is not the way you expected your life to go two weeks ago when (inaudible)… the point being there are some things that we wanted to talk to you about, if you are willing. Do you want to keep talking? |
| Agent Three: | It's a lot, it's a lot… |
| Agent One: | You won't get this chance again. I can guarantee you that. So I were, were…It's up to you. We want to give you an opportunity to hear what we have to say. |
| Defendant: | I am listening. |
| Agent One: | So that form you signed where you said you are fine with speaking with us without your attorney. You want to continue with us telling you… |
| Defendant: | I can still stop at any time? |
| Agents: | Yeah. You can. |
| Agent One: | Do you want to continue at this time? |
| Agent Two: | It's kind of a yes or no question. |
| Agent One: | Yes? |
| Agent Three: | Is that a yes? Ok. |

The agents' conduct constitutes "badgering", and it is not simply asking clarifying questions following what the agents may have believed to be an ambiguous statement. First, the statement was neither on its face ambiguous nor did the agents understand it as such based on their subsequent responses. Second, what followed was not a mere clarifying question, but a concerted and coercive effort by three agents (of the five total who were present) to have Singleton change his mind about asking for a lawyer. Notable is that the first agent who spoke (sitting across Singleton) said "if you want to talk to an attorney, you

11

can but it will be to your benefit to understand what we are talking about so you can talk to your attorney" which indicates he clearly understood Singleton's previous statement to be an unequivocal and clear invocation.

The badgering and undercutting Singleton's decision is also evident in repeated statements by two different agents in the interview that he is being offered a unique opportunity, and one of them even guaranteed that Singleton would not have this opportunity again. The agents also told him it would not end well for him if he told anyone he had spoken with them, essentially implying that he had already potentially put himself in danger by speaking to the agents so he might as well continue. The agents violated Singleton's Miranda rights because they clearly undercut his unambiguous invocation to have an attorney present.

      C.      **Singleton's Second Invocation is a Clear and an Unambiguous Invocation of his Miranda Rights Which the Agents Again Disregarded.**

Approximately 15 minutes after his first invocation, Singleton invoked his right to an attorney again with the following statement: "Can I just speak with my lawyer." *See* Exhibit A. at 54:48. This is basically, word for word, the statement that the defendants in *Hunter* and *Lee* made and which was deemed sufficiently clear and unambiguous invocation. Singleton said: "Can I just speak with my lawyer? I have never been through anything like this. I don't understand." (Hunter's statement was "Can you call my attorney?" and Lee's "Can I have a lawyer?").

When Singleton invoked his right to an attorney for the second time, three agents immediately started closing their notebooks and laptops in apparent readiness to stop the interview right then and there. *Id.* at 54:49. It is clear from both the wording of the statement as well as from the agents' behavior afterwards (getting ready to leave), that this statement was an unambiguous and clear invocation. On the wording alone, Singleton's

12

second statement is even a stronger invocation that in *Lee* or *Hunter*. First, he does not just refer to "a lawyer" but to "my lawyer", which indicates that Singleton already had a specific lawyer in mind and did not just generally contemplate whether it is possible for him to get a lawyer. Second, Singleton used the adverb "just" in "can I just speak with my lawyer." In this sentence, "just" is used to place focus and emphasis on "speak" similar to a sentence when someone, in exasperation, says "can you just do it!". With the adverb "just", Singleton's statement stops being an interrogative sentence but becomes essentially an exclamatory and imperative type of a sentence.

Still one agent kept pressing on, despite the other agents preparing to leave. As stated in *Hunter*, there is no place for clarification when the statement is unambiguous. *Hunter*, 708 F.3d at 947. Any additional questions, "no matter how 'benign' or 'open-ended'"—by the agents would be undercutting Singleton's decision. *Id.* In *Hunter*, one of the detectives responded to the defendant's request for an attorney ("Can you call my attorney?" – found by the Seventh Circuit to be sufficient) by asking in return: "what do you want me to tell these people?" 708 3.d. at 947. The Seventh Circuit said that even assuming the detective did not intend his question to undercut Hunter's request for counsel, given the circumstances, Hunter could have viewed detective's follow-up question as an indirect way of undercutting his request for counsel. "It is precisely for this reason that the Supreme Court held in *Smith,* 'Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, *all questioning* must cease." *Id.* quoting *Smith* at 469 U.S. at 98.

What transpired after Singleton's second unambiguous invocation is another clear case of undercutting, initially couched as a "clarification", without Singleton's initiating the conversation on his own. The interview never ceases, and Singleton is caught in incessant prodding to keep answering questions. One of the agents immediately undercuts: "So that I

13

understand, you want to close this interview and close the book on this opportunity?". *See* Exhibit A, at 54:56. Singleton again clarifies his intentions: "What is that going to do for me [inaudible]. I need someone [inaudible] with me. I have never been through nothing like this before" *Id*. at 55:05. As they are packing their things, the agents continue undercutting, this time threatening that the U.S. Attorneys on the case would not like that Singleton initially lied about some nicknames and hence, that they would not want to "circle back" with Singleton at another time. *Id*. at 55:18. At this point, this is not just badgering and undercutting but also a clear attempt to reinitiate interrogation by bringing in some factual statements Singleton made earlier in the interview and essentially calling upon Singleton to address those allegedly false statements. This blatant disregard for Singleton's rights went on for another fourteen minutes, as agents were trying to get him to change his mind. At one point, one of the agents said that if he were to get an attorney, he might just get charged: "Do you want to get charged? That's your choice". *Id* at 1:05:26.

Once Singleton unambiguously invoked his right to an attorney, all questioning should have stopped and there was no room for clarification, let alone undercutting, coercing, and attempting to change his mind and continue the interrogation. What the agents did here, just like after in the first invocation, was a clear violation of Singleton's Miranda rights.

## CONCLUSION

Singleton's first invocation was a clear and unambiguous invocation of his Miranda rights that should have been scrupulously honored and ended all discussion and questioning. In the alternative, Singleton's second invocation was a clear and unambiguous invocation that should have stopped any further interrogation. The agents' follow up questions to both statements were, at a minimum, impermissible badgering or undercutting

14

of Singleton's decision, if not even a continued interrogation, all of which is prohibited by law.

WHEREFORE, for all the forgoing reasons, Defendant respectfully prays this Honorable Court grant this motion and for any such other relief as this Court deems just.

Respectfully submitted,

*/s/Joshua B. Kutnick*
Joshua B. Kutnick

**Joshua B. Kutnick**
**900 W. Jackson Blvd, Ste 7E**
**Chicago, IL 60607**
**312-441-0211**
**jkutnick@gmail.com**

**CERTIFICATE OF SERVICE**

I, Joshua Kutnick, an attorney, do hereby certify that I caused a copy of the foregoing motion to be served upon:

Patrick Mott
U.S. Attorney's Office, Fifth Floor
219 South Dearborn Street
Chicago, IL 60604

pursuant to Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, L.R. 5.5, and the General Order on Electronic Case Filing of the United States District Court for the Northern District of Illinois, Eastern Division on February 23, 2024.

*s/ Joshua Kutnick*
Joshua Kutnick